## Moore et al. v. Caldwell, Jr., et al.

*Frederic H. Spotts, George Wharton Pepper, Pepper, Bodine & Stokes, Philip H. Strubing,* and *Evans, Bayard & Frick,* for complainants.

*Thomas Raeburn White, W. Wilson White* and *White & Williams,* for respondents.

LEWIS, J., September 25, 1947.—This case came on to be heard on bill in equity, answers and proofs.

### Statement of the pleadings

The controversy relates to the conduct of two of three voting trustees who are registered holders of the outstanding shares of common stock of J. E. Caldwell & Company, a corporation operating a retail jewelry business in the City of Philadelphia, and somewhat to the conduct of the business itself by the elected officers and appointed executives for the corporation. The business, owned by J. E. Caldwell & Company, is an old,

established one, founded by J. Emott ·Caldwell, the great-grandfather of one of the defendants, J. Emott Caldwell, Jr., and was formerly a partnership with general and limited partners. In 1932 it was determined to incorporate the business, in the management of which the Caldwell family had ceased to be active, although retaining large financial interests as limited partners. The bill averred that the limited partners agreed to permit their capital to remain in the business following incorporation on condition that they should receive shares of preferred stock in exchange for their capital and that for the protection of this preferred stock all the shares of voting common stock should be placed in a voting trust; that the voting trust agreement was duly executed and is dated February 1, 1933, and incorporates in itself by reference the plan of incorporation of the company, dated December 12, 1932, which plan discloses the reason for the creation of the voting trust.

The plan of incorporation referred to recites that the limited partnership would expire by limitation on January 31, 1933; that the general partners at that time were William R. Eisenhower, Charles W. Oakford, Ralph C. Putnam and George A. Moore, and the limited partners were Edward T. Chase, the Estate of J. Albert Caldwell, deceased, and the Estate of James Emott Caldwell, deceased; that "the condition of the business will not permit of the repayment of any of the capital of the limited partners at the expiration of the partnership on said date, January 31, 1933"; that all parties had agreed that the liquidation of the business would be ruinous, and that the interests of all parties would be best conserved by a continuance of the business, and that such continuance was impossible unless the capital of the limited partners was allowed to remain in the business; that said limited partners, however, were not so willing, "without some control over the management", which could not be ob-

tained through a limited partnership, and that, therefore, it had been determined to incorporate the business under the laws of Pennsylvania. The plan of incorporation further disclosed that the corporation was to have an authorized capital stock of $845,000 par value cumulative nonparticipating preferred stock and 10,000 shares no par value common stock; that the preferred stock should be redeemable from time to time, and in order to accomplish the redemption, a sinking fund of 25 percent of the net earnings of the company in each year should be set up and applied to the retirement of preferred stock, which preferred stock should have no voting rights; that so long as any of the preferred stock should remain outstanding, all of the common stock should be placed in a voting trust consisting of three persons, who were named in the plan. Provision was made for the filling of vacancies in the office of voting trustees. The original voting trustees were J. H. Tuttle, William R. Eisenhower and Evan Randolph. The plan set forth that in the case of a vacancy in the place of J. H. Tuttle or his successor, such vacancy shall be filled by a majority vote of the preferred stock, each share being entitled to one vote; in the case of a vacancy in the place of William R. Eisenhower or his successor, such vacancy shall be filled by majority vote of the holders of voting trust certificates for common stock, each share representing one vote; in case of a vacancy in the place of Evan Randolph or his successor, such vacancy shall be filled by majority vote of the preferred and common stockholders, each share being entitled to one vote. It was stipulated that the voting trustees may act in all matters by a majority vote, with or without meeting, and that they should not be entitled to any compensation for their services, "but shall not be disqualified from serving as directors or officers of the company, or from receiving compensation for their services as such directors or officers, or in any other capacity."

Paragraph 5 of the plan states that in order to insure, as far as possible, the continuance of the then present management and policies of the company, the common stockholders were to enter into an agreement among themselves obligating one another not to sell or transfer any of the common stock without first offering such stock for sale to the other common stockholders, or to such of them as might wish to buy, at a price to be mutually agreed upon or to be fixed by arbitration; also, that in the event of death of any of the common stockholders, the surviving common stockholders should have the right to purchase all, but not less than all, of the common stock of such deceased stockholder, which option should continue for 90 days from receipt of notice of desire to sell. Of course, the term "common stock" included voting trust certificates, and the term "common stockholders" included holders of voting trust certificates for common stock. This plan of incorporation was signed by all of the general and limited partners.

Exhibit "A" is a list of the holders of the voting trust certificates for common stock outstanding as of the date of the bill, and such holders are as follows:

| | |
|---|---|
| Charles W. Oakford | 1,921 shares |
| George A. Moore | 361 " |
| J. Morton Caldwell | 1,175 " |
| Jean C. Hayes | 1,175 " |
| Annie G. Putnam | 1,060 " |
| Girard Trust Company & Carrie May Eisenhower, Trustees u/w of William R. Eisenhower, Deceased | 1,000 " |
| J. Emott Caldwell, Jr. | 1,175 " |
| Frances M. Caldwell | 1,174 " |

The preferred stockholders, as listed in said Exhibit "A", as of the date of the filing of the bill, are as follows:

| | |
|---|---|
| Girard Trust Company, Frances Maule Caldwell, and John M. Hays, surviving and substituted Trustees u/w of James Emott Caldwell, Deceased | 1,532 shares |
| Girard Trust Company, Trustee u/w of Edward T. Chase, Deceased, registered in name of Steere & Co. | 1,720 " |
| Girard Trust Company, Trustee under deed of trust of James A. Caldwell and Nathalie Caldwell dated December 21, 1942, registered in name of Steere & Co. | 645 " |
| J. Morton Caldwell | 493 " |
| Jean C. Hayes | 485 " |
| J. Emott Caldwell, Jr. | 492 " |

The bill averred that plaintiffs were, at the time of the filing of the bill, holders of voting trust certificates aggregating 6,692 shares of common stock of J. E. Caldwell & Company, a corporation, out of a total issue outstanding of 9,041 shares; that plaintiffs also owned between them 4,875 shares of the outstanding preferred nonvoting stock, and that this was all of said preferred stock that had not been redeemed with the exception of 492 shares owned by defendant, J. Emott Caldwell, Jr., individually; that defendants, J. Emott Caldwell, Jr., his mother, Frances M. Caldwell, and Charles W. Oakford, are the present voting trustees, and as such are the registered holders of all of the common stock of the corporation; that the business of the corporation has been successfully conducted by the present officers and directors, and that plaintiffs are satisfied with the present management and believe and aver that as long as the present management is continued, plaintiffs' interests and the interests of all preferred stockholders will be adequately protected; that the then next annual meeting of the corporation was scheduled to be held on Tuesday, March 11, 1947,

and that with that annual meeting in prospect, defendant, J. Emott Caldwell, Jr., and his mother, Frances M. Caldwell, who together constitute a majority of the voting trustees and hence could control the voting of all the common stock, had informed plaintiffs that they proposed at the annual meeting thus fixed to use their voting power to elect a new board of directors "pledged to elect said J. Emott Caldwell, Jr., president of the corporation," and that the said J. Emott Caldwell, Jr. had stated to some of the plaintiffs that, once elected president, he intended to discharge all heads of departments. The bill asserted that the third voting trustee, Charles W. Oakford, had strongly protested against this course.

Continuing, the bill averred that if the two Caldwells were permitted to carry out their purpose as a majority of the voting trustees, irreparable injury would be done to the corporation and its business through the breakdown of the morale of employes, through the impairment of public credit, and through the loss of the services of valued and experienced officers. It was stated that defendant J. Emott Caldwell, Jr., who proposed to bring about his own election as president, was "a young man 31 years of age, with only such a superficial knowledge of the business as may be obtained after nine months' experience as a clerk, with a temperament unsuited to executive management, and lacking the confidence not only of the key employes but of all parties in interest in the stock, except his mother."

The bill recited that the voting trust had no definite terminal date, since it was to continue as long as any preferred stock should be outstanding, but that the trust was revocable by the holders of a majority of the voting trust certificates with the approval of all (except defendant, J. Emott Caldwell, Jr.) of the holders of preferred stock for whose exclusive protection the trust was alleged to have been created; that plaintiffs

were advised, believe and so aver that the proposed action of the two Caldwells, mother and son, as a majority of the voting trustees, "to use their voting power for the purpose of promoting the personal interest of one of them" constituted a breach of trust, which should be enjoined, and because of which one or the other of the two Caldwells' should be removed from the voting trusteeship or the trust should be dissolved.

Plaintiffs, therefore, prayed for an injunction and for the removal of J. Emott Caldwell, Jr., as a voting trustee, or that, in the alternative, a decree be made dissolving the voting trust and directing a distribution of the shares of common stock to the owners.

Defendants Caldwell filed separate answers. J. Emott Caldwell, Jr., the son, in his answer, set up that he is the owner in his own right of voting trust certificates representing 1,175 shares of common stock of the Caldwell corporation, and 492 shares of preferred stock; that he has a one-third remainder interest in the 1,532 shares of preferred stock held by the trustees under the will of James Emott Caldwell, deceased; that he had been duly elected a voting trustee on October 11, 1939, by the preferred stockholders of the company to fill the vacancy caused by the resignation of J. H. Tuttle. His answer also admitted that the business had been financially successful in the recent past, but stated that defendant does not admit that a continuance of all the policies of the present management unchanged would be in the interests of the stockholders of the company; that in view of the preliminary injunction granted by this court, the proposed annual meeting had been postponed, and it was denied that answering defendant or his mother had informed plaintiffs that they would use their voting power at the proposed annual meeting to elect a new board of directors pledged to elect answering defendant president of the corporation, or that he had stated that once elected he would discharge all heads of departments. Mr. Cald-

well, Jr., asserted that he intends to use his voting power as a voting trustee solely in the interests of the company and stockholders thereof; that while he believes that certain changes in the management of the company would be advantageous, he has no intention whatever of endeavoring to cause himself to be elected president at this time and no intention of having all the heads of departments discharged, as alleged. He denies that he contemplates or had contemplated any action which would injure the corporation or its business or would result in a loss of business or credit or impairment of the morale of the employes. He asserts that his knowledge of the Caldwell business was obtained through an active interest in the company's affairs for a period of over seven years, during which time he had served as a voting trustee and as a director of the company; that he had also served as an account executive in charge of all the company's advertising for a period of approximately 18 months, and as a salesman for approximately nine months. This defendant denied that the voting trust is revocable except by agreement in accordance with the terms of the voting trust. He asserted that the continuance of the voting trust is essential to the preservation of the interests of those for whom it was created, and he denied that he has at any time made any proposal to use his voting power for the purpose of promoting his personal interests.

Defendant mother, Frances M. Caldwell, answered similarly to her son, denying that she had at any time informed plaintiffs that she would use her voting power at the annual meeting to elect a new board of directors pledged to elect her son president of the corporation. She averred that she intends to use her voting power solely in the interests of the company and the stockholders, and asserts that the continuance of the voting trust is essential to the preservation of the interests of those for whom it was created.

No answer appears to have been filed by or on behalf of Charles W. Oakford, the third voting trustee, or J. E. Caldwell & Company, a corporation, joined as a defendant.

From the pleadings offered and admitted in evidence, and from the proofs, we make the following

*Findings of fact*

1. Plaintiffs herein are holders individually or in a fiduciary capacity of a majority of the shares of preferred nonvoting stock and of voting trust certificates representing a majority of the shares of common stock of J. E. Caldwell & Company (herein called company), a Pennsylvania corporation. More particularly, plaintiffs are holders of 4,105 shares of preferred nonvoting stock, being all of that class of stock outstanding except for 492 shares owned by defendant, J. Emott Caldwell, Jr. Plaintiffs are also holders of voting trust certificates representing 6,692 shares of common stock, being all of that class of stock outstanding except for 2,349 shares with respect to which defendants J. Emott Caldwell, Jr. and Frances M. Caldwell own voting trust certificates representing 1,175 and 1,174 shares, respectively.

2. Defendants J. Emott Caldwell, Jr., his mother, Frances M. Caldwell, and Charles W. Oakford are registered holders of all the common stock of company in the capacity of voting trustees.

3. J. E. Caldwell & Company, a Pennsylvania corporation, is engaged in the retail jewelry business in Philadelphia, Pa., and is joined formally as a defendant.

4. Pursuant to a plan of incorporation dated December 12, 1932, the company was organized in 1933 to take over and did take over, the assets and business of a preëxisting limited partnership of the same name. Under the plan of incorporation the limited partners allowed their capital to remain in the business on con-

dition that they receive one share of $100 par value preferred stock for each $100 of special capital, and that for the additional protection of their capital all shares of voting common stock be placed in a voting trust.

5. Pursuant to the plan of incorporation, the voting trust covering the common stock of company was created by voting trust agreement dated February 1, 1933. Pertinent provisions of the voting trust agreement provide that the voting trust is to be administered by three named voting trustees, or their successors, who are given the power to vote the common stock of company as a majority of the trustees shall determine; the voting trustees are not disqualified from serving or receiving compensation as officers or directors of company; provision is made for the election of the successor of one trustee by vote of the holders of preferred stock, of another trustee by vote of the holders of the voting trust certificates representing the common stock, and of the third trustee by combined vote of the holders of preferred stock and voting trust certificates, and the voting trust is to continue so long as any of the preferred stock remains outstanding.

6. The present voting trustees are successors to those originally named in said voting trust agreement, defendant J. Emott Caldwell, Jr., having been elected trustee by the holders of preferred stock, defendant Frances M. Caldwell having been elected by the holders of voting trust certificates and preferred stock, and Charles W. Oakford having been elected by the holders of voting trust certificates.

7. The business of company has been successfully conducted by the present officers and directors, who enjoy the confidence of the employes. From February 1, 1933, to January 31, 1947, the company earned sufficient profits to accumulate an earned surplus of $495,000, to retire 3,853 shares of preferred stock at par for $385,300, and to pay dividends of approxi-

mately $523,000 on the preferred stock and of approximately $164,000 on the common stock. For the fiscal year ended January 31, 1947, the gross sales, less returns and allowances, were $3,305,000, the largest in company's history.

8. All holders of preferred stock and voting trust certificates except defendants J. Emott Caldwell, Jr., and Frances M. Caldwell are presently satisfied with the existing management of company.

9. Defendant, J. Emott Caldwell, Jr., has a substantial interest in the management and business of J. E. Caldwell & Company through ownership of preferred and common stock and is sentimentally interested in the institution on account of his relationship to the founder of the business.

10. There is no evidence that defendant J. Emott Caldwell, Jr., has in any way misconducted himself as a voting trustee of the voting trust for the stock of J. E. Caldwell & Company.

11. In January and February 1947 a proposal for reorganization of the management of J. E. Caldwell & Company was made by defendant J. Emott Caldwell, Jr., to four codirectors and officers of the corporation as necessary, in his opinion, to eliminate deficiencies in the conduct of the business. The proposal included the election of Mr. Caldwell, Jr., as president.

12. The Caldwell, Jr., plan as disclosed by plaintiffs' evidence involved the election of a board of five directors, three of whom are plaintiffs in this case. As they have testified that they are opposed to the election of J. Emott Caldwell, Jr., as president, he would not have been chosen even if the plan had been pursued.

13. Defendant J. Emott Caldwell, Jr., has now given up and abandoned any plan to make himself president of the corporation at this time.

14. No evidence has been presented from which the chancellor could find that defendant J. Emott Caldwell,

Jr., is unfitted to perform the duties of an officer or employe of J. E. Caldwell & Company.

15. No evidence was introduced in support of the allegation in paragraph 7 of the bill, that defendant Frances M. Caldwell informed plaintiffs that she together with her son would use her voting power at the annual meeting to elect a board of directors pledged to elect J. Emott Caldwell, Jr., president of the corporation.

16. No evidence was introduced in support of the allegation in paragraph 9 of the bill that defendant Frances M. Caldwell had made any proposal which constitutes a breach of trust for which she should be removed as a voting trustee.

17. The fact that defendant Caldwell, Jr., conferred openly with several of plaintiffs, being officers and directors of the corporation, and disclosed to them frankly his then purpose to reduce the size of the board of directors and to bring about, by vote of himself and his mother, a change in the membership of the board, and that he intended to seek election as president of the corporation negatives any intention or purpose to act covertly or recklessly or for his personal interest and advantage.

18. The motive and purpose of J. Emott Caldwell, Jr., in making the proposal for a reorganization of the board of directors and of the management of the company, as above found were not selfish. Regardless of its merits or demerits, the plan for reorganization was put forward for the purpose of serving what proponent thought to be the best interests of the corporation and its stockholders.

19. The preferred stockholders of the company, with the exception of Mr. Caldwell, Jr., lacked confidence in the judgment and ability of Mr. Caldwell, Jr., as a possible president of the Caldwell corporation.

20. All preferred stockholders of the corporation, other than J. Emott Caldwell, Jr., and the holders of

voting trust certificates of the company other than Mr. Caldwell, Jr., and his mother, and the officers and other members of the board of directors of the corporation at the time of the hearing appear to lack confidence in the judgment and ability of Mr. Caldwell, Jr., as a voting trustee.

21. The evidence is insufficient to justify the chancellor in adjudging that the continued service of defendant J. Emott Caldwell, Jr., as a voting trustee will be detrimental to the interests of the company or to the preferred stockholders.

22. The preferred stockholders of the company, other than defendant Caldwell, Jr., and Mrs. Frances M. Caldwell, life beneficiary of the estate of J. E. Caldwell, deceased, have declared their desire to terminate the voting trust governing the common stock of the Caldwell corporation.

### *Discussion*

This bill was filed to enjoin J. Emott Caldwell, Jr., and Mrs. Frances M. Caldwell, his mother, two of three voting trustees under a trust instrument, from voting the shares of common stock of J. E. Caldwell & Company, a corporation, at an annual meeting of the corporation which was scheduled to be held on Tuesday, March 11, 1947. The bill also prays that J. Emott Caldwell, Jr., be removed as a voting trustee, or that in the alternative a decree be made dissolving the voting trust.

The complaint upon which the prayers for relief are based is that J. Emott Caldwell, Jr., and his mother had "informed the plaintiffs that they, being a majority of the voting trustees, proposed at the annual meeting to use their voting power to elect a new board of directors pledged to elect said J. Emott Caldwell, Jr., president of the corporation; and defendant J. Emott Caldwell, Jr., has stated to some of plaintiffs that, once elected president, he intends to discharge all heads of

departments." It is averred that the third voting trustee, Mr. Oakford, had strongly protested the intended action of his cotrustees, and that this protest is endorsed by all of plaintiffs. The bill averred that if the plan of a majority of the voting trustees were carried out, it would work irreparable injury to the corporation; that J. Emott Caldwell, Jr., is a young man, 31 years of age, with only a superficial knowledge of the Caldwell business, obtained after nine months' experience as a clerk, and with a temperament unsuited to executive management. It was further charged that he lacked the confidence of the key employes and of all the stockholders other than his mother.

As we have found, the voting trust instrument provides that the trust is to continue as long as any of the preferred stock is outstanding. There was at the time of the filing of the bill preferred stock outstanding of a par value in excess of $500,000, 492 shares of which were owned by defendant J. Emott Caldwell, Jr., and 1,532 shares of which formed part of the estate of James Emott Caldwell, deceased, of which estate two of plaintiffs are trustees with Mrs. Frances M. Caldwell, a defendant. Mrs. Caldwell is the life beneficiary of that estate, with remainder to her children, one of whom is J. Emott Caldwell, Jr., the others being two of plaintiffs, J. Morton Caldwell and Mrs. Jean Caldwell Hayes.

The bill, in paragraph 9, avers that the proposal by two of the voting trustees "to use their voting power for the purpose of promoting the personal interest of one of them, constitutes a breach of trust" justifying the removal of the trustees from their trust offices or the dissolution of the trust itself. This conclusion in paragraph 9 is the only statement in the bill imputing wrongdoing to the two voting trustees. In their answers defendant trustees denied the allegations of the bill to the effect that they had informed plaintiffs that they would use their voting power at the annual meeting

in accordance with the statements of the bill. Mr. Caldwell, the son, answered that he intended to use his voting power solely in the interests of the company and the stockholders, saying also that while he believed that certain changes in the management would be advantageous "he has no intention whatever of endeavoring to cause himself to be elected president at this time and no intention of having all the heads of departments discharged as alleged." He asserted that he had been actively interested in the affairs of the company for a period of over seven years, during which he served as a voting trustee and as a member of the board of directors; that he had also served as an account executive in charge of all of the company's advertising for a period of 18 months, and as an employe of the company in its sales department for a period of approximately nine months.

Mrs. Caldwell made similar responses. Mrs. Caldwell concluded her answer by denying that she has at any time made any proposal to use her voting power for the purpose of promoting the personal interest of her son. Both defendants opposed the dissolution of the voting trust. These answers were responsive, and plaintiffs had the burden of proof to support the bill.

The evidence offered on behalf of plaintiffs consisted mainly of the testimony of four members of the board of directors: John Malcolm Johnston, who is also vice president of the Girard Trust Company, which is trustee of three estates having stockholdings in the corporation; George Alexander Moore, who is president of J. E. Caldwell & Company; Eugene T. Jump, who is vice president and treasurer, and Charles W. Oakford, who is chairman of the board of directors.

From the testimony of these witnesses it appeared that defendant Caldwell, Jr., in January and February 1947 had separate conferences with Messrs. Jump, Moore and Oakford, and informed each of them that he was dissatisfied with the manner in which the busi-

ness of the Caldwell company was being conducted, particularly as to the quality of some of the merchandise that had been displayed and sold during the time of his connection with the business, and that he had a plan in his mind to endeavor at the annual meeting, which was to be held in the following March, to bring about a reduction in the number of members of the board of directors to five, three of whom would be Messrs. Johnston, Jump and Moore, with himself as a fourth member and the fifth member not yet decided upon; that his plan included the election of himself as president of the corporation in succession to Mr. Moore; that Mr. Moore was to become chairman of the board and to be active in guiding the business. It was testified that Mr. Caldwell, Jr., frankly informed Mr. Oakford that his proposal contemplated Mr. Oakford's retirement from the chairmanship of the board and the relinquishment of his salary. Also that if the plan were effected, Mr. Caldwell, Jr., planned to bring about the retirement of several of the department heads of the business because of dissatisfaction with their management of their respective divisions. These meetings of Caldwell, Jr., with the persons named were all held upon the initiative of Caldwell, Jr., and as was natural, they resulted in conferences among the remaining directors and the officers.

Mr. Johnston, vice president of the Girard Trust Company, testified that upon the proposal coming to his attention he had a meeting with Mrs. Frances M. Caldwell to talk over the situation with regard to the store and the desire of J. Emott Caldwell, Jr., and that he advised Mrs. Caldwell against the plan and suggested or said that the holdings represented by the Girard Trust Company would be in opposition to the plan. He stated that Mrs. Caldwell then asked him to talk to her son Emott about the proposal "because she agreed with the suggestions" that Mr. Johnston made. He said that he talked to Emott two days later, at

which time Emott outlined his ideas with regard to the management of the company and stated that he thought an intolerable condition existed which should be promptly rectified; that Emott mentioned the persons involved in the intolerable condition, including officers of the company and employes.

The testimony of Mr. Johnston was to the further effect that following the last-mentioned conference, he again conferred with Emott Caldwell and with Mr. Harry Butcher, 3rd, a broker, during which his callers suggested that Mr. Oakford should be removed as chairman of the board and Emott should be placed in the presidency and other changes should be made, including the removal of eight key employes. Mr. Johnston detailed the complaints made by Mr. Caldwell, which included a statement that he thought that Lybrand, Ross Brothers and Montgomery, Inc., accountants, were really running the company and not the officers; that the officers were not performing the duties which their titles indicated; that an inferior type of merchandise had been bought in the silver department and it cost the company a lot of money to make good; that they had been waiting to obtain adequate china plates for a long time and when the shipment came in, no one knew about it, despite the requests of customers, and the management did not wake up to the situation until too late and missed sales; that Mr. Moore, the president, spent too much time making up payrolls and did not know what was going on around the store.

Mr. Johnston said that Mr. Caldwell, Jr., wanted his support for his program, and that when he next saw him on February 18th, which was 11 days later, in the trust company's offices, he had a three quarters of an hour conference with Emott Caldwell and advised him that after careful consideration, the trust company could not go along with his suggestions. Johnston testified that at the previous conference he, Johnston, had

told young Caldwell that he would think the matter over and let him know, and at the February 18th conference the negative decision was given, after which he explained to Emott Caldwell the reasons why the trust company could not go along with his plan.

The reasons thus given consist principally of the statement that the company had recently been doing remarkably well, that a substantial part of the preferred stock had been redeemed since 1939 through the application of profits—in other words, the business was prospering and Mr. Johnston saw no reason for making changes. Mr. Johnston stated that the trust company's decision was arrived at purely as a matter of duty; that there was nothing against Emott Caldwell personally, and that he, Johnston, had no personal feeling about the matter, and that this attitude was again communicated to Messrs. Caldwell and Butcher on March 3rd, when, Mr. Johnston said, "Mr. Butcher stated at that time he felt the family would go along and there was nothing that we could do about it, and I said I was not so sure about that". The witness added that there followed a general discussion of the whole plan with reference to the change in management, and that no further conferences were held by him with Mr. Caldwell, Jr.

Upon the return to the city of Mrs. Frances M. Caldwell, however, Mr. Johnston testified a conference was arranged in the trust company's offices with Mrs. Caldwell, her son, Morton Caldwell; her son-in-law and daughter, Mr. and Mrs. John M. Hayes. Messrs. Oakford, Moore and Jump were also present. At this meeting Mr. Johnston explained to Mrs. Caldwell the difficulty that the trust company was "up against"; that "we could not see our way clear to go along with Emott's suggestions and that it was up to her to decide which position she would support". Following this, Messrs. Oakford, Moore and Jump were called upon to give their views, and they then retired from the

meeting and the witness continued his discussion with Mrs. Caldwell, pointing out to her the difficulties in the situation and that it was a very serious matter as far as the business was concerned; "that even though Emott might have considerable ability, at the same time he had a very limited experience and a rather unfortunate temperament to endeavor at this time to take over the head of the company or the management of the company." When asked if Mrs. Caldwell had taken a definite position with respect to her son's program, the witness replied that Mrs. Caldwell stated that she could not give an answer then but she would have to seek further advice, and that he subsequently heard from Mr. Appel, a member of the bar, who stated that he was acting as counsel for Mrs. Caldwell and her son Emott, and that he would accept service of the proposed bill in equity.

Avoiding repetition, the foregoing may be said to fairly summarize the case of plaintiffs with respect to the alleged misconduct of J. Emott Caldwell, Jr., and his mother as voting trustees. The essence of the allegation is that they planned to use their fiduciary powers to serve the "selfish" interests of the son in his desire to become president of the corporation and to direct the management of the business. Plaintiffs assume that the complaints of Mr. Caldwell, Jr., with respect to the deficiencies in the management of the business were and are without foundation and that they really masked a selfish purpose to obtain the presidential office and its emoluments.

We have not been convinced by the testimony and the circumstances that this assumption is altogether sound. To the contrary, we are persuaded that Caldwell, Jr., was acting in good faith, in that he was sincerely of opinion that there were deficiencies in the management of the business that called for rectification. Whether this critical attitude was well-founded

in fact, we are not called upon to find, nor are we qualified to fairly pass upon such a question, since it involves business practices and other factors as to which we have not been informed by the evidence. It is sufficient for the purposes of our decision, however, that we are persuaded and find that the position taken by the voting trustee was not arbitrary, was not motivated by a desire for self-aggrandizement at the expense of or risk of the business of the corporation, but was a reasonable exercise of such judgment and knowledge as the voting trustee possessed.

Reading the testimony with care, we have failed to find any proof whatever that Mrs. Caldwell, the mother, at any time declared her intention to cast her vote as a voting trustee in support of the plan projected by her son. As far as the evidence indicates, Mrs. Caldwell refrained from taking a definite position in advance of the meeting, and while this was undoubtedly disconcerting to plaintiffs and explains their submission of the matter to a chancellor, it does not support the averments of the bill to the effect that Mrs. Caldwell had informed plaintiffs that she proposed to use her voting power in the manner set forth in paragraph 7 of the bill. In the absence of the disclosure of a definite position or purpose, plaintiffs, perhaps rather justifiably, feared the worst, but the averment is stronger than the facts justified.

Of course, in view of this lack of evidence, Mrs. Caldwell cannot be found to have acted wrongfully or to have been derelict through inaction. She took no definite stand as to the plan of reorganization, and so far as we can find, would have been in a position to act at the annual meeting in accordance with her best judgment and for the best interests of the owners of the business.

In analyzing further the nature of the proposal made by Emott Caldwell, we find that the evidence is all in agreement that he would not have been in control

of the board of directors had he been allowed to and been able to bring about the consummation of the plan at the stockholders' annual meeting. His purpose was to reduce the board of directors to five, but a majority of three of this number would have consisted of Messrs. Johnston, Moore and Jump. It nowhere appears in the evidence that these three persons could have been induced to elect Emott Caldwell as president of the corporation. If they had been persuaded so to elect him, they could have imposed adequate conditions with respect to the suggested dismissal of any of the key employes in the business. The board of directors direct the conduct of the corporation, and have adequate control over any person who is elected by them as president, hence as far as his purpose was disclosed, Emott Caldwell had not threatened arbitrary seizure of power through the coöperation of his mother. The fact that he had frankly and fully disclosed his attitude successively to Messrs. Oakford, Jump and Moore negatives any intention to act arbitrarily, covertly or recklessly in the exercise of his power as a voting trustee.

As was suggested at the trial, Emott Caldwell, Jr., might well have brought to the attention of the board of directors, of which he was a member, the deficiencies in the management of which he complained, and it would appear to the chancellor that he should have done so in order that the board of directors might have had the opportunity to fully investigate the facts, and the officers and employes who were criticized might have had due opportunity to make their explanations of defense. But certainly the evidence shows nothing but what may well have been no more than a tentative plan in the mind of Emott Caldwell, not yet acquiesced in or supported by either of the other voting trustees, and hence not capable of consummation. Furthermore, even if the tentative plan had been made definite by a

vote of the majority of the trustees, there still remained the hurdle set up by the antagonistic majority of the reduced board of directors. This has to be considered in passing upon the fundamental issue in the case as to whether the voting trustee, vested with a discretion and with a duty to use his best judgment in the interests of the business, even though that best judgment dictated the election of a complete new board of directors and the setting up of an entirely new management, was motivated by a desire to serve himself rather than the corporate interests. A decision that the motive was wrongful would be virtually a finding that the trustee was guilty of dishonesty or of fraud, and under the evidence we cannot so find.

The relationship of mother and son existing between two of the three voting trustees undoubtedly caused plaintiffs some embarrassment, and creates a situation that is unusual in business enterprises. A mother's natural affection for and confidence in her son undoubtedly tends to make her less objective than an unrelated person might be in the consideration of ideas advanced by the son, but that fact does not justify a conclusion in this case that Mrs. Caldwell did not have other sufficient reasons for supporting her son's suggestions or for refraining from taking an attitude in opposition to them prior to the holding of the annual meeting. Mrs. Caldwell is quite apparently a woman of intellect and of strong purpose, and there is nothing in the evidence to justify a chancellor in believing that she would subordinate her obligations as a trustee to self-interest, to the interest of her son, or in opposition to the best interests of the stockholders whom she represents, including her other son, Mr. Morton Caldwell, and her daughter, Mrs. Hayes. As members of the Caldwell family, Mrs. Caldwell and her son express and undoubtedly possess family pride in the successful continuance of the Caldwell business, which has acquired the character of a Philadelphia institution.

Again, we must not overlook the facts that Mrs. Frances M. Caldwell was elected a successor voting trustee by the combined holders of the voting trust certificates and the preferred stock, and J. Emott Caldwell, Jr., was elected a voting trustee on October 11, 1939, by vote of the holders of the preferred stock of the corporation. It was obviously known to these certificate-holders and stockholders that Mrs. Caldwell was the mother of J. Emott Caldwell, Jr. Hence, the mere existence of the relationship of mother and son cannot be successfully advanced as an objection to the continued service of either the mother or the son as a voting trustee.

Nor is the fact that the mother and son were in agreement as to some phases of the performance of their respective duties as voting trustees any substantial basis for the impeachment of their respective motives in arriving at such harmony of opinion and purpose. The voting trustees must, under the agreement, act by the majority votes of two persons out of three. It was to have been expected that upon occasion Mrs. Frances M. Caldwell and J. Emott Caldwell, Jr., would agree, and that the third voting trustee might be in opposition. As voting trustees, all three of the incumbents are trustees under the law, and are required to act in the interest of those whom they represent in a fiduciary capacity. This, however, does not negative action based upon discretion or best judgment; in fact, the use of sound discretion and judgment is an obligation imposed upon fiduciaries, and it undoubtedly was within the contemplation of the stockholders and certificate holders that the voting trustees, having the power to elect the board of directors and thus to bring about a reorganization of the business, might, in the exercise of honest and reasonable discretion, feel themselves called upon so to act.

Such a trustee cannot be impeached and removed for acting or proposing to act according to his or her best

judgment, although that judgment might be questioned by the minority voting trustee or by the stockholders or by the executives of the corporation. As we have said, the voting trust was set up for the very purpose of giving power to a majority of three trustees to act, according to their information and judgment, for the best interests of the stockholders and the business. To justify the removal of such a trustee, there must be evidence of conduct exhibiting something more than what others may consider to be bad judgment; it must clearly appear that the trustee had been guilty of wrongful conduct—some disregard of his fiduciary obligation amounting to malfeasance.

The bill and the evidence in support of its averments with respect to J. Emott Caldwell, Jr., emphasize his asserted youth and inexperience. He was a much younger man when he was chosen by the preferred stockholders to be a voting trustee, and he possessed even less experience than he had gained up to the time of the filing of the bill. He has served for many years as a member of the board of directors, and for some months was an employe of the business. At the age of 31 many men are made executives of much larger corporations, with much greater responsibilities. Also many persons are made the heads of large enterprises and institutions without prior experience in the particular industry or activity in which such enterprises and institutions are engaged. Some very recent notable examples might here be referred to. Bearing in mind the long history of the business, the somewhat sensitive nature of the enterprise as luxury merchandising, in which continuity of public confidence is important, we agree with plaintiffs that Mr. Caldwell was proposing to act somewhat precipitately, and that it probably has been to the best interests of the business that the reorganization was enjoined and more deliberation assured.

However, Mr. Caldwell has declared under oath that he has entirely abandoned any plan to oust the present board of directors of the corporation at the next annual meeting to be held, or to otherwise act with his mother in other than a deliberate and conscientious manner in the exercise of their duties as voting trustees. Mrs. Caldwell has said, "I vote as I choose. I am not influenced by anything my son says." Also, "I would vote against him"—meaning against her son—if she did not agree with his proposals. While Mrs. Caldwell did say that she "supposed" that in some of the positions she had taken as a voting trustee she had been motivated by a desire either to assist or protect her son, her personality and her intelligence convinced us that she is and will continue to be a thoroughly conscientious person in the exercise of her duties as voting trustee.

It is unfortunate that the apparently able managers of the Caldwell business, particularly the president, Mr. George A. Moore, were compelled to take so strong a stand of personal opposition to one of the voting trustees, but we do not believe, and under the evidence cannot possibly find, that the bad feeling that this opposition may have engendered will lead either Mr. Caldwell or his mother to act as voting trustees in any other manner than conscientiously and fairly, not only with respect to the business but with respect to the personnel now in the management of the business. That all parties have full confidence in Mr. Moore's ability and integrity is evidenced by the fact that the plan of reorganization put forward by J. Emott Caldwell, Jr., contemplated a continuance of Mr. Moore as the actual head of the business through service as chairman of the board of directors.

Having concluded that the evidence will not support a decree removing J. Emott Caldwell, Jr., as a voting trustee, we consider the alternate prayer—that we make a decree terminating the voting trust itself. While the common law did view voting trusts with

504

some suspicion (Boyer v. Nesbitt, 227 Pa. 398, 402), and by a statute (Business Corporation Law of May 5, 1933, P. L. 364) that became effective a few months after this particular voting trust was created, such trusts were limited to a 10-year period, a voting trust is a well-recognized device for insuring continuity of management and for other lawful and commendable purposes. The Caldwell trust was created primarily to protect the capital of the former limited partners, which capital was to remain in the corporate business and to be evidenced by preferred stock. Until all of this preferred stock shall have been redeemed, the reason for the continuance of the trust exists. Evidence was offered that all of the holders of the preferred stock other than Mr. Caldwell, Jr., who possesses 492 shares, now wish the trust ended. Mr. Caldwell, Jr., and his mother oppose such action. Mrs. Caldwell is beneficiary for life of the estate of J. E. Caldwell, deceased, that owns 1,147 preferred shares and her son has a one-third interest in remainder in that estate. We have not the power to nullify a voting trust instrument in a summary manner against the objections of the holder and beneficiaries of a substantial number of the shares.

We have carefully considered the opinion of our Supreme Court in Bryson v. Wood, 187 Pa. 366. It is true that a voting trusteeship is by appointment of the stockholders and certificate holders, and the Supreme Court in the Bryson case (which did not involve a voting trust) said that a trustee who has lost the confidence of the fiduciaries who appointed him should not continue in office. The Supreme Court also stated that it is not material that the trustee was innocent of actual misfeasance; that his conduct ought to meet the approval of those whose interests are to be protected, for his sole duty is to them. The facts differ greatly from those which we must construe. In the case before us the voting trustee is himself one of the so-called

debtors or stockholders the protection of whose interests was the object of the creation of the voting trust, and he has the same right as the other holders of preferred stock to insist upon the continuance of the trust.

In Brown v. McLanahan, 148 F. (2d) 703 (C. C. A. 4th, 1945), the circuit court reversed because it was able to find and did find that there had been an abuse of trust by the voting trustees in that they had used their voting power for their own benefit.

Under the circumstances existing in the case before us, if we exercised the power of a court of equity to end the voting trust, we should be acting arbitrarily, since there is no adequate proof of fraud or other misconduct or delinquency on the part of the voting trustees, and there are objections to the termination. The preferred stock which J. Emott Caldwell, Jr., owns outright, 492 shares, is more than 10 percent of the shares outstanding, and the estate of his father, J. E. Caldwell, deceased, as we have said, holds 1,147 shares, or an additional 24 percent. He and his mother are the holders of voting trust certificates of 2,349 shares of common stock, or 26 percent of the outstanding issue. See Mackin v. Nicollet Hotel, 25 F. (2d) 783 (C. C. A. 8th) ; Herman v. Dereszewski, 312 Mich. 244, 20 N. W. (2d) 176; Alderman v. Alderman, 178 S. C. 9, 105 A. L. R. 105; Hearst v. American Newspapers, 51 F. Supp. 171.

The Supreme Court of Michigan said in the Herman case that "Mere dissension, dissatisfaction and lack of harmony over questions of policy and management do not justify" a cancellation of the voting trust agreement, in the absence of fraud or misconduct by the voting trustees or directors or officers. The trial court was held to be without the power under such circumstances to decree a termination of the trust. We take a similar view.

Because of the somewhat unusual conditions existing with respect to the Caldwell corporation, we will

not dismiss this bill, although we are denying the prayers thereof, but will retain jurisdiction of the cause for one year from the date of final decree in order that any party to the proceeding may apply to the court for relief in the event that the necessity arises. Of course, plaintiffs may at any time discontinue the action if they desire, or a motion may be made on behalf of all parties to dismiss the bill with or without conditions.

We make the following

### Conclusions of Law

1. The voting trust agreement was executed for the protection of the holders of preferred stock of J. E. Caldwell & Company, is valid and cannot be revoked or the trust be dissolved without the consent of the holders of all of the outstanding preferred stock.

2. No legal ground has been shown for the removal of defendant J. Emott Caldwell, Jr., as a voting trustee.

3. For the reasons indicated in the discussion, we will retain jurisdiction of the bill of complaint herein for one year from the date of final decree unless plaintiffs shall in the meantime request the dismissal of the bill, or shall mark the cause ended of record.

And now, to wit, September 30, 1947, we enter the following

### Decree nisi

1. The prayers for relief contained in the bill are refused.

2. Because of the nature of the controversy, jurisdiction of the bill will be retained for one year from this date, for the reasons and purposes set forth in the discussion and in the conclusions of law.

EDITOR'S NOTE—No exceptions were filed to the foregoing decree nisi.